Filed 5/22/23  In re I.D. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.D. et al., Persons Coming Under the Juvenile Court Law. | B317786 (Los Angeles County Super. Ct. No. 21CCJP04473) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.D., Defendant and Appellant. | |

APPEAL from the dispositional order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Reversed.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Timothy M. O'Crowley, Principal Deputy County Counsel, for Plaintiff and Respondent.

—————————————

The juvenile court assumed jurisdiction over I.D. and Y.D. after their parents engaged in multiple incidents of domestic violence. The sustained allegations all concern violence inflicted by mother against father. On appeal, father does not contest these jurisdictional findings. Father contests the dispositional order insofar as it removes the children from his custody.

We conclude that no substantial evidence supported the juvenile court's finding that no reasonable means existed to protect the children short of removal from father's custody. Upon remand, the trial court shall hold a new dispositional hearing and order the Los Angeles County Department of Children and Family Services (DCFS) to comply with Welfare and Institutions Code[1] section 224.2 and the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA). As father points out, social workers did not inquire of any extended family members concerning the children's potential Indian ancestry, and the juvenile court's ICWA finding was based merely on the parents' ICWA forms, which we have held does not alone satisfy ICWA.

—————————

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

## BACKGROUND

Mother and father were not married.[2]  They dated for four years and lived together on and off during that time period. They had two children—I.D. and Y.D. Mother had a third child from a different relationship.  Father is I.D. and Y.D.'s presumed father.

Both mother and father have a dependency history from childhood.  Mother's history as a juvenile resulted from maternal grandmother's substance abuse.  Father was removed from his paternal grandmother, but DCFS was unable to locate any additional information.  Mother also had a prior dependency history as a parent involving her eldest child, the children's half sibling.[3]

DCFS initiated an investigation in 2019 for domestic violence involving mother and father.  Mother had called law enforcement after father allegedly pushed mother into a wall, causing her to hit her head.  According to mother, father pushed her after mother asked father to "stop mocking" I.D.  DCFS reported that father would be charged with domestic battery and simple assault, but the record does not show that the People either charged or convicted him.  It appears that DCFS's involvement in the 2019 case ended when mother stated she would move out of the home and father agreed to get a restraining order.  The social worker involved in the prior proceeding indicated, "At the time of the closure I had no

---

[2]  Mother is not a party to this appeal.

[3]  The father of the children's half sibling indicated that "mother has a pattern in which she would threaten to maliciously and falsely call the police."

concerns as the mother started residing elsewhere . . . ." (Italics omitted.)

Both mother and father have an arrest record. Mother's arrests included battery and domestic violence. Father's involved grand theft, battery of a police officer, battery with serious bodily injury, and domestic violence. The record does not indicate whether any arrest resulted in a criminal conviction.

Father did not want to cooperate with DCFS during the current dependency proceedings. According to him, he "truly believed that this case was like a criminal case and [he] wasn't supposed to talk to DCFS" without his attorney present.[4]

During the dependency proceedings, the children were removed from their foster placement because of allegations of abuse and neglect in the placement home. A person (unidentified by DCFS) "physically abused" Y.D. and I.D. was at risk of similar abuse. Y.D. had bruises on his cheeks, left ear, lip, and eyelid. I.D. reported that the children's foster mother would hit the children when she was angry.

## 1.    *Petition*

In September 2021, DCFS filed a section 300 petition identifying I.D. (then three years old) and Y.D. (10 months old) as dependent children. (Their half sibling also was named in the petition but is not part of the current appeal.) The petition alleged that mother and father have a history of engaging in

---

[4] Both mother and father refused to be interviewed about their background. Father told the social worker, " 'I'm not going to have a conversation unless you bringing [*sic*]my kids back . . . talking to you won't help me.' " Father rebuffed other efforts by social workers to contact him.

violent altercations in the presence of the children. *On July 27, 2021, mother threw a toy at father, and the toy hit I.D. and cut her lip.* Mother brandished a knife and threatened to stab father. The petition alleged mother hit father's forearm, chest, and neck with a guitar. On prior occasions mother and father shoved each other in the presence of the children resulting in her arrest for intimate partner violence with injury. Mother also had a history of domestic violence with the father of I.D. and Y.D.'s half sibling. (I.D. and Y.D.'s half sibling had the same mother but a different father.) After a contested adjudication hearing, the juvenile court sustained these allegations against both parents under section 300, subdivision (b)(1), based on failure to protect the children. The court struck the above italicized language as well as all allegations under section 300, subdivision (a), governing serious physical harm inflicted nonaccidentally (§ 300, subd. (a)).[5]

---

[5] Section 300 provides in pertinent part: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:

"(a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury.

According to DCFS, father told a law enforcement officer that on July 27, 2021 (referencing the incident in the petition), he left the family home after a verbal altercation with mother. "When he returned to the location he discovered she had blocked the door to the location. He was able to gain access to the residence. She [mother] grab[bed] a box of toys and attempted to throw it at him. The box missed him and struck one of their children. Then she armed herself with [a] knife. She was standing approximately 2 feet from him and stated, 'I am going to stab you.' He advised she didn't have the knife anymore. He didn't advise what happened to the knife. He stated she obtained a guitar and then struck him 3 times with a guitar. Once in the right forearm, once in the chest, and once in the back of the neck." DCFS reported that call logs from the Los Angeles Police

---

"(b)(1)  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:

"(A)  The failure or inability of the child's parent or guardian to adequately supervise or protect the child.

"(B)  The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left.

"(C)  The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment.

"(D)  The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Department showed "six calls to law enforcement regarding domestic disturbances between the mother" and father from January 2020 through July 2021.

When a social worker asked about the incident described in the petition father "indicated that he did not recall the incident . . . ." Father reported that paramedics treated I.D. because Y.D. hit her "with the crib . . . ." Father denied that mother hit him with a guitar. Father denied any prior incidents of domestic violence. Father denied that mother used a knife or that she threatened to stab him. Father denied that mother hit I.D. with a toy when mother threw the toy. Father also indicated he had no intention of obtaining a restraining order against mother. Father stated that he went to the police because mother falsely accused him. Mother denied any domestic violence between her and father.

The children's half sibling told a social worker that mother and father "both push each other, kind of like a competition." (Boldface omitted.) Sometimes when mother and father argued, the children were in the same room as mother and father. The children's half sibling estimated that mother and father argue once a month. He further indicated that when mother and father argue," 'one of them leaves the home in order to cool off.' " Social workers reported that during an interview, I.D. stated, " '[M]ommy and daddy fight, mommy called daddy stupid.' "

On September 1, 2021, father told a social worker that he and mother were separating and mother would move out of the home. On September 3, 2021, mother told a social worker she and father intended to pursue marriage counseling and to reside together. On October 27, 2021, mother told a social worker that she and father had ended their relationship a year earlier.

7

Mother indicated she continued to live with father because a few months earlier, the family quarantined together for COVID-19. In November 2021, father told a social worker that he and mother were in a relationship until DCFS removed the children from the home. At that time, mother moved out of the home.

Social workers interviewed mother and father prior to the dispositional hearing. In a supplemental report dated November 2021, mother stated she and father had ended their relationship. Mother reported she had moved into a shelter.

Father again denied the allegations in the petition. Father believed mother called the police "as a tactic to harm him." Father stated the children were never harmed in his care. Father indicated that he was diagnosed with depression and met with a therapist to treat his depression. Father further reported mother had moved out of the home and their relationship had ended. Paternal grandmother also told a social worker that mother and father were no longer in a relationship and reported father was participating in services.

Prior to the dispositional hearing, father enrolled in a "fatherhood program" and had attended two sessions but missed three. Father enrolled in a domestic violence program and counseling but did not consistently attend. Father explained he was trying to reenroll and was on a waiting list. According to father, he did not consistently attend his classes because the timing conflicted with his visits with his children.

DCFS concluded: "Since the start of this case, the father . . . has demonstrated a lack of cooperation with the Department, which has prevented the Department from assessing his parental protective capacit[ies]." "The Department remains concerned in that the end of the romantic relationship

between the parents, does not suffice for the parent's [*sic*] having the skills, knowledge, and ability, to create a safe home environment, free of violence in which the children can thrive in. The parent's [*sic*] have a history of engaging in domestic violence incidents which they have not addressed. Additionally, [father] has not made substantial progress in services which could further mitigate the risk of harm to the children."

### 2. *After a hearing, the court removes the children from father's custody*

Father testified at the January 4, 2022 dispositional hearing. According to father, he had enrolled in domestic violence and parenting classes. Father testified the domestic violence class was offered at the same time as monitored visits with his children. Father chose to visit the children instead of attending class. He testified he later reenrolled in a domestic violence class at a different time. He also testified that he notified the monitor of the conflict and she changed the time for his visit, although she did not do so immediately.

At the time of the hearing, father was enrolled in individual counseling, a domestic violence program, and parenting classes. Father had attended five domestic violence classes. Father testified he and mother were no longer in a romantic relationship and mother had moved out of the family home. They ended their relationship to better parent their children. Father testified he had learned about the indirect consequences of domestic violence on his children's lives. He also thought about the children's mental health and safety. Father further testified he would cooperate with DCFS if the court ordered the children returned to his care. Father added that he

9

had been in therapy for depression for four years and was taking his prescribed medication.

On cross-examination, father acknowledged that he continued to communicate with mother about the children and the dependency proceedings. Father would sometimes add mother through Facetime to his visits. Father had not yet signed a release for DCFS to speak to his therapist or his domestic violence counselor.

DCFS argued that the children would not be safe if released to father. DCFS stated that the petition involved "mutual serious domestic violence between the mother" and father—albeit the petition alleged only mother was the aggressor. Counsel for DCFS argued father was not credible when he testified that he and mother were no longer in a relationship.

Father's counsel emphasized that father was the victim in the July 27, 2021 incident. Counsel asserted father was willing to comply with any conditions if the court returned the children to his care. The children's counsel argued that father needed "time to show progress in his programs."

The juvenile court ruled as follows: "Both parents' attorneys don't talk about anything other than this last incident that happened. These parents have been in a toxic relationship for four years. There was a referral back in 2019 [(two years earlier)] with domestic violence. There has been, at least, four times the police came out on domestic violence charges . . . ." This is a total picture of a toxic parenting between mom and dad. They argue and, ultimately, get into fights and they think just because they're not fighting that's not domestic violence. And these poor kids are living in this home where the parents are yelling and screaming at each other . . . ." The court indicated

10

that the calls to law enforcement were "because the parents are arguing . . . with each other.  So this is a relationship that is beyond toxic.  And these children . . . were living in it and they're not going to live in it until these parents reunite by getting involved in programs."

The court found by clear and convincing evidence that ordering the children in father's custody would create a substantial danger to the children's physical and mental well-being.  The court found no reasonable means to protect the children without removal.  The court ordered father to complete a 26-week domestic violence class for perpetrators, a parenting class, and individual counseling to address issues of domestic violence and anger management.  The court ordered father's visits to be monitored.

### 3.    *Background regarding ICWA*

Father filed a form indicating that neither he nor the children are members or eligible for membership in an Indian tribe.  Mother filed the same form also stating that neither she nor the children are members or eligible for membership in an Indian tribe.  Mother told social workers that her "family is of Moorish culture."  On September 28, 2021, the juvenile court confirmed with mother and father's counsel that mother and father completed the forms.  The form states in boldface:  "Note: This form is not intended to constitute a complete inquiry into Indian heritage.  Further inquiry may be required by the Indian Child Welfare Act."

Based on those forms and counsel's confirmation that the parents had indicated no Indian heritage on those forms, the juvenile court found it did not have reason to know that I.D. and Y.D. are Indian children as defined by ICWA.  The court ordered

11

mother and father to alert their counsel and the court if they obtained any new information.

In October 2021, DCFS reported that they evaluated maternal aunt and paternal grandmother for placement. Maternal grandmother was not assessed because she had extensive DCFS and criminal history. DCFS did not recommend releasing the children to maternal aunt, who also had DCFS and criminal history. DCFS recommended against releasing the children to paternal grandmother because although she initially wanted custody of I.D., she later changed her mind. Social workers did not question maternal aunt, maternal grandmother, or paternal grandmother about Indian ancestry.

The juvenile court appears to have agreed with DCFS's finding that no extended family member should be considered for custody. Specifically, the court noted in a minute order the "minors to remain as suitably placed" because the relative assessments were "negative."

## DISCUSSION

### A. No Substantial Evidence Supports the Order Removing I.R. From Father's Custody

Father argues that the juvenile court should not have removed the children from his custody because his "home did not pose a risk of substantial danger to the children at the time of the dispositional hearing" and "other reasonable means existed by which the children could have been protected other than removal from Father's home." Specifically, father argues that the juvenile court could have placed the children with him under strict supervision, including unannounced visits. Respondent contests these assertions.

12

In order to determine whether to remove a dependent child from a parent's custody, the juvenile court must assess "whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R.*)) To remove children from a parent's custody the juvenile court must find by clear and convincing evidence the children would be at substantial risk of danger if they remained in the parent's custody. (§ 361, subd. (c)(1).) We review the record as a whole to determine if it "contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005; see *I.R.*, *supra*, 61 Cal.App.5th at p. 520.)

In *I.R.*, this court reviewed a challenge to a dispositional order removing an infant I.R. from a father's care after a finding of domestic violence. The father threw a shoe at the mother's head and slapped one side of her face, causing redness and swelling. (*Supra*, 61 Cal.App.5th at p. 513.) Mother reported a second incident eight months earlier, but indicated that the most recent incident was the only time the father hit her. (*Id*. at p. 514.) I.R. remained in mother's custody but was detained from her father. (*Id*. at p. 515.) Although the father initially was unwilling to communicate with DCFS during the detention investigation, the father eventually reported that the incident was a " 'one-time thing,' " that he was ashamed, and that he did not " 'want that to happen again' . . . ." (*Id*. at p. 516.) At the

dispositional hearing, I.R.'s counsel was opposed to removing I.R. from father's care. (*Id*. at p. 518.)

We reversed the order removing I.R. from father's custody. We explained: "A finding of parental abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child. [Citations.] Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*I.R.*, *supra*, 61 Cal.App.5th at p. 520.) We concluded that "two instances in which Father slapped Mother, the second of which also involved him throwing a baby shoe at her—do not support a reasonable inference that he is a generally violent or abusive person." (*Id*. at p. 521.) Father had no criminal record or prior referrals and the danger I.R. resulted from the violence between father and mother "not danger resulting from I.R. being in Father's care." (*Ibid*.) Further, the record contained no substantial evidence that the domestic violence between father and mother was likely to continue. (*Ibid*.) There was no basis to conclude that mother and father would not stay away from each other. (*Ibid*.)

Here, the petition alleges mother was the aggressor, and it was undisputed that mother had moved out of the family home even though DCFS argued that mother and father continued having a romantic relationship. Respondent emphasizes that mother and father have a long history of domestic violence, but there was no evidence the children were harmed or that either parent targeted the children. Also, there was evidence that when mother and father would argue, one of them would leave the

14

house in order to " 'cool off.' " Father also testified he had learned "the importance of having his children not exposed to domestic violence." Even though the juvenile court did not have to credit father's testimony, the court had to assess risk to the children at the time of the hearing if left in father's custody, not simply emphasize the "toxic" nature of mother and father's relationship. In addition, no substantial evidence supported the conclusion that no other means short of removal were available to protect the children.

We reject respondents' effort to distinguish *I.R.*, *supra*, 61 Cal.App.5th 510. Respondent incorrectly asserts that unlike in *I.R.*, this case involved a prior "child abuse referral." The 2019 referral—the only prior referral involving father—contained allegations of domestic violence, not child abuse. According to DCFS, I.D. "was in her crib during the DV incident; child was not hurt." Additionally, DCFS found the referral "[i]nconclusive."

Respondent correctly points out that in contrast to *I.R.*, mother and father lived in the same city and continued to have contact. The fact that mother and father live in the same city and communicate with each other does not show that the children are at risk of harm in father's custody. Even if father's testimony that he and mother spoke only about the children and the case were discredited, there was no other evidence that at the time of the dispositional hearing, father and mother continued their romantic relationship or continued to engage in violent interactions. Although we agree with respondent that this case involves a greater number of incidents of domestic violence than the two described in *I.R.* and that father has an arrest record, the governing statute requires focusing on potential harm to the children at the time of the dispositional hearing. Here the

15

children were not harmed while they lived with father, and as noted above, there was no evidence parents continued to be involved in a romantic relationship.

Respondent argues that substantial evidence supports removing the children from father's custody "because the parents' relationship was toxic, resulting in repeated incidents of domestic violence, often requiring law enforcement interventions." Respondent quotes the following from *In re T.V.* (2013) 217 Cal.App.4th 126, 135 (*T.V.*): "Even if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." [Citations.]' [Citation.]"

Respondent's argument supports the juvenile court's assumption of jurisdiction, which father does not contest. The cycle of violence described in *T.V.* upon which respondent relies was the basis for upholding dependency court jurisdiction. (*Supra*, 217 Cal.App.4th at p. 135.) Relying on evidence supporting jurisdiction, however, is not sufficient because the burden of proof is " ' "substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home" ' or the physical custody of a parent." (*I.R.*, *supra*, 61 Cal.App.5th at p. 520.) Respondent's reliance on mother and father's "toxic" relationship does not, without a showing of substantial risk of harm to the children and no other alternative means of providing safety, demonstrate that it was necessary to remove the children from father's custody.

Finally, we reject respondent's argument that its "belief" is sufficient to show a substantial risk by clear and convincing

16

evidence. Specifically, respondent argues it "believed that despite parents' claim that their 'romantic relationship' had ended, that did not mean they had the skill, knowledge, [or] ability to create a safe home environment free of violence for the children." Respondent's "belief" cannot substitute for *evidence* of risk of harm to the children. Respondent cites no evidence to support its conclusion that father did not have the skill, knowledge, or ability to create a safe home. The record, moreover, shows that father did try to minimize harm to the children by leaving the home when he and mother argued. Also, as father contends, the juvenile court could have imposed restrictions on father's custody and required social workers conduct unannounced visits to protect the children instead of removing them from his custody.

## B.   The Initial ICWA Inquiry Was Insufficient

Father asserts DCFS failed to satisfy its initial duty of inquiry under section 224.2. Respondent does not dispute that DCFS should have asked available extended family members about the children's possible Indian heritage but claims this failure was not prejudicial.

"At the outset of a dependency case, the child welfare agency and the juvenile court have a statutory initial duty to inquire into whether a child is, or may be, an Indian child. 'The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." [Citation.]' [Citation.]" (*In re Darian R.* (2022) 75 Cal.App.5th 502, 507, fn. & italics omitted.)

Under ICWA, the term " 'extended family member' " is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).) "DCFS's failure to inquire of extended family members does not result in automatic reversal. [Citations.] Instead, we must examine the record and reverse or remand only if that review shows prejudice because there was ' "information that was likely to bear meaningfully upon whether the child is an Indian child." ' [Citation.]" (*In re Adrian L.* (2022) 86 Cal.App.5th 342, 350 (*Adrian L*).)

It is undisputed that social workers did not satisfy their initial duty of inquiry. There is no evidence they asked the children's extended family members about the children's potential Indian ancestry. The juvenile court made its finding that ICWA did not apply based merely on forms completed by mother and father. Following *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015–1016, we conclude that the reliance exclusively on the forms prejudiced father. The forms themselves state that the forms do not "constitute a complete inquiry into Indian heritage." (Boldface omitted.) We recognize that social workers evaluated extended family members for custody, but neither the social workers nor the court proceeded to evaluate these relatives because of their dependency or criminal histories. In contrast to *Adrian L.*, *supra*, 86 Cal.App.5th at p. 345, there was no "extensive efforts by Mother, Mother's counsel, extended family members, and minor's counsel" to have the children placed with the extended family members such that "additional inquiry

18

would not have yielded information that was likely to bear meaningfully on the question of whether Adrian is an Indian child." (*Ibid*.) We find no record support for respondent's conclusion that it is "not likely these relatives 'possessed knowledge of the children's possible tribal affiliation superior to Mother's and Father's disclaimer of any such ancestry.' " Upon remand, the juvenile court should ensure compliance with the requirements of section 224.2.

## DISPOSITION

The dispositional order is reversed. The juvenile court is directed to hold a new dispositional hearing within 30 days of the issuance of the remittitur. On remand, the court may consider new evidence and changed circumstances that may have occurred during the pendency of this appeal. The juvenile court is directed to instruct the Los Angeles County Department of Children and Family Services to comply with the requirements of Welfare and Institutions Code section 224.2.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.                    WEINGART, J.

19